# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| PATRICIA YOUNG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:12-00050 |
| v. | ) | Judge Nixon/Brown |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

To: The Honorable John T. Nixon, Senior United States District Judge

## REPORT AND RECOMMENDATION

This action was brought under to 42 U.S.C. §§ 405(g) and 1383(c) to obtain judicial review

of the final decision of the Social Security Administration (SSA), through its Commissioner ("the

Commissioner"), denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title

II of the Social Security Act (the Act), 42 U.S.C. §§ 416(i), 423(d), and  Supplemental Security

Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq*.  For the reasons explained

below, the undersigned **RECOMMENDS** that the plaintiff's motion for judgment on the record (DE

14) be **DENIED**, and the Commissioner's decision **AFFIRMED**.

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for DIB and SSI on June 6, 2008 alleging a disability onset date

of March 16, 2004.  (DE 10, pp. 90-101)  Plaintiff's claims stem from the alleged effects of a heart

attack that she suffered on that date.  Her claims were denied on September 4, 2008, and again upon

reconsideration on October 22, 2008.  (DE 10, pp. 49-54, 56-61)

Plaintiff, through counsel, filed a request for a hearing before an Administrative Law Judge

(ALJ) which was held on December 1, 2009 before ALJ Joan A. Lawrence.  (DE 10, pp. 28-44, 62-

67) Vocational expert (VE) Edward W. Smith testified at the hearing. (DE 10, pp. 89, 41-44) The ALJ entered an unfavorable decision on January 5, 2010, holding that plaintiff had not been under a disability from March 16, 2004 through the date of the decision. (DE 10, pp. 11-25)

Plaintiff filed a request with the Review Council on November 29, 2011 seeking review of the ALJ's decision. (DE 10, pp. 7-10) The Appeals Council denied the request on May 10, 2012 (DE 10, pp. 1-6), whereupon the ALJ's decision became the final decision of the Commissioner.

Plaintiff brought this action on June 15, 2015 seeking judicial review of the Commissioner's decision. (DE 1) Thereafter, plaintiff filed a motion for judgment on the administrative record on November 13, 2012 (DE 14), to which the Commissioner responded in opposition on February 11, 2013 (DE 18). This matter is now properly before the court.

## II. REVIEW OF THE RECORD

### A. Relevant Medical Evidence

Plaintiff went to the Crossville Medical Center on March 16, 2004 complaining of "severe chest discomfort radiating into the neck associated with nausea and shortness of breath." (DE 10, p. 181) Plaintiff was transferred to St. Thomas Hospital in Nashville, where she underwent heart catheterization and a stent implanted in her right coronary artery. (DE 10, pp. 181-88)

The record shows that plaintiff saw Dr. Samuel Ong, M.D. at the Cumberland Heart Clinic in Crossville several times after she was released from St. Thomas. (DE 10, pp. 190-202) On April 7, 2004, Dr. Ong noted in his office consultation report (OCR) that plaintiff told him that she was "nervous and uncertain about her cardiac condition . . . [that] . . . she ha[d] trouble sleeping and feels tired . . . [but that] . . . [s]he . . . has had no recurrence of chest pain." (DE 10, p. 198) Dr. Ong also noted that plaintiff was "+ for fatigue,"[1] "+ for occasional shortness of breath," "+ intermittent chest

---

[1] "Positive" is represented by "+" in Dr. Ong's OCRs.

2

pain . . . atypical for angina," "+ for mild dyspnea on exertion,"[2] "no syncope,"[3] "no palpitations,"[4] "no myalgia,"[5] and no "unusual headaches . . . [but] . . . + for occasional dizziness." (DE 10, p. 198)

Plaintiff saw Dr. Ong on October 27, 2004. (DE 10, pp. 196-97) Dr. Ong noted in the OCR that plaintiff mentioned she "bruises easily," noting further that she had "[n]o fatigue," "[n]o shortness of breath," "[l]ess chest pain," "less dyspnea," "no dyspnea on exertion," "no syncope," "no palpitation," "no myalgia," and "no unusual headache[s] . . . [or] . . . dizziness." (DE 10, p. 196)

On November 17, 2004, plaintiff saw Dr. Ong following a motor vehicle accident (MVA) for which she was treated at the Cumberland Medical Center (CMC) in Crossville. (DE 10, pp. 194-95) Plaintiff told Dr. Ong that she had "a lot of aches and pain in h[er] right knee, left knee, neck, etc." from the accident, but that "[o]ther than that, she ha[d] no complaints." (DE 10, p. 194) Dr. Ong noted in the OCR that plaintiff reported "no fatigue," "[n]o shortness of breath," "[n]o chest pain," "no dyspnea on exertion," "no syncope," "no palpitations," and "no unusual headache[s] . . . [or] . . . dizziness." Dr. Ong reduced plaintiff's Crestor medication because of "active myalgia."

Plaintiff saw Dr. Ong on February 17, 2005. (DE 10, pp. 192-193) Dr. Ong noted in the OCR that plaintiff was "feeling better . . . [that she was] . . . recovering from her recent MVA . . . [and that she] complain[ed] of a cold . . . ." (DE 10, p. 192) Dr. Ong noted further in the OCR that plaintiff reported "no fatigue," "[n]o shortness of breath," "[n]o chest pain," "[n]o dyspnea on

---

[2] Dyspnea . . . "Breathlessness or shortness of breath, difficult or labored respiration." *Dorland's Illustrated Medical Dictionary* 582 (32nd ed 1202).

[3] Syncopal . . . Fainting. *Dorland's* at 1818.

[4] Palpitations . . . "A subjective sensation of an unduly rapid or irregular heart beat." *Dorland's* at 1365.

[5] Myalgia . . . Muscle pain. *Dorland's* at 1254.

exertion," "no syncope," "no palpitations," "no myalgia . . . [or] arthralgia,"[6] and "no unusual headache[s] . . . [or] . . . dizziness." (DE 10, p. 192)

Plaintiff last saw Dr. Ong on March 22, 2005. (DE, pp. 190-91) Dr. Ong noted in the OCR that plaintiff was "feeling better overall [with] much less frequent chest pain,"[7] noting further that she has "no fatigue," "[n]o shortness of breath," "+ for chest pain which is less frequent than before," "+ for dyspnea on exertion," "no syncope," "no palpitations," "no myalgia [or] arthralgia," and " no unusual headache[s] . . . [or] . . . dizziness." (DE 10, p. 190)

Plaintiff was treated at CMC nineteen times from April 20, 2004 to July 28, 2008. (DE 10, pp. 237-307) She was seen three times for high cholesterol, once for fatigue on June 7, 2004 in connection with a diagnosis of possible diabetes, once for a cough, four times following the November 1, 2004 MVA noted above, and ten times for physical therapy for muscle spasms in the back. CMC ran numerous blood tests and urinalysis, and took four x-rays. The x-rays all were normal for purposes of plaintiff's claims. (DE 10, pp. 257, 260, 276, 288, 306, 370, 379-80)

Plaintiff was treated monthly by Primary Care Associates (PCA) from January 11, 2006 to September 17, 2008. (DE 10, pp. 214-36, 321-65) A review of the records shows that plaintiff complained of myriad problems over the two-plus years she was treated by PCA. The medical issues reported by plaintiff relevant to this action were: degenerative joint disease (DJD),[8] hypertension, fatigue, and fainting (syncope). Although the record shows instances where these problems were worse, PCA records show that these issues were stable or getting better most of the time.

---

[6] Arthralgia . . . Joint pain. *Dorland's* at 150.

[7] There is nothing in the record to explain why plaintiff reported "much less frequent chest pain" given that she had reported no chest pain previously.

[8] DJD . . . Osteoarthritis. *Dorland's* at 1344.

Plaintiff's DJD complaints, first reported to PCA on June 28, 2006 (DE 10, pp. 236, 249) and reported through September 17, 2008 (DE 10, pp. 236, 249, 321), were assessed as stable or getting better more than two-thirds of the time. The PCA records show plaintiff's DJD as stable to worse during the last several months of her treatment by PCA, on one occasion after plaintiff had been "working in [the] garden." (DE 10, p. 323)

Plaintiff's hypertension, first reported to PCA on July 5, 2006 and reported through September 17, 2008 (DE 10, pp. 235, 348), was assessed as stable or getting better more than two-thirds of the time. Plaintiff's hypertension was assessed as stable to "OK" on each occasion during the last six months of her treatment by PCA.

Plaintiff's complaints of fatigue, first reported to PCA on December 11, 2007 and reported through April 28, 2008 (DE 10, pp. 214, 218, 331), were assessed as stable to getting better throughout that period. Fatigue was not reported as an issue during plaintiff's last five months of treatment by PCA.

Plaintiff's fainting spells, first reported to PCA on February 20, 2007 and reported through September 18, 2007 (DE 10, pp. 221-28, 334-41), were assessed as stable or getting better one hundred percent of the time. Fainting was not reported as a complaint during the last year-plus of plaintiff's treatment by PCA.

On August 23, 2008, plaintiff underwent a residual functional capacity (RFC) examination by consultant physician Dr. Jerry Lee Surber, M.D. on behalf of the Tennessee Disability Determination Services. (DE 10, pp. 308-11) Dr. Surber noted in his report that plaintiff complained of "shortness of breath on minimal exertion," and said that she had "asthmatic bronchitis for many years." (DE 10, p. 308) Dr. Surber observed, however, that plaintiff "did not appear to be short of breath during this exam." (DE 10, pp. 308, 311) Plaintiff told Dr. Surber that she suffered

from hypertension, but her blood pressure at the time of the exam was 110/80, borderline normal. (DE 10, pp. 308-09)  Plaintiff denied having chest pain.  (DE 10, pp. 308, 310-11)  Plaintiff complained of arthritis pain,[9] which was worse on cold and/or rainy days, and caused stiffness and fatigue.[10]  (DE 10, pp. 308, 311)  Plaintiff complained of "intermittent dizziness," which Dr. Surber noted was not apparent at the exam.  (DE 10, pp. 308, 311)  Plaintiff complained of pain in her neck, greater on the right side than on the left, and in her back, greater on the lower left than lower right, but Dr. Surber noted that plaintiff was in no acute distress at the time of the exam.  (DE 10, pp. 308-11)  Plaintiff's lungs were clear bilaterally, with no audible wheezes.  (DE 10, p. 310)  Plaintiff had full and unlimited mobility in her joints, and was able to do a full voluntary squat and stand maneuver.  (DE 10, p. 310)  Plaintiff was able to do straight-leg rises in the sitting and supine positions.  (DE 10, p. 310)

Following what can best be described as a underline(normal) exam, Dr. Surber determined that plaintiff had the RFC to:

> occasionally lift or carry at least 10 to 35 pounds during up to one-third to one-half of an 8-hour work day . . . [that] [s]he would be able to stand or walk with normal breaks for up to 2 to 4 hours in an 8-hour workday or sit with normal breaks for up to 6 to 8 hours in an 8-hour workday.

(DE 10, p. 311)

The following month, Dr. Joe G. Allison, M.D. performed a physical RFC assessment of plaintiff on September 3, 2008.  (DE 10, pp. 312-19)  Noting that plaintiff's symptoms "are not supported by the largely normal clinical findings . . . ," and that Dr. Surber's medical assessment was "too restrictive and . . . . not supported by the largely normal findings at his own exam," Dr. Allison

---

[9]  Dr. Surber noted that plaintiff was taking medication – Hydrocodone – for arthritis.  (DE 10, p. 309)

[10]  Plaintiff established in her testimony, *infra* at p. 8, that this condition predated her heart attack.

determined that plaintiff had the following exertional limits: 1) able to lift and/or carry 50 pounds occasionally; 2) able to lift and/or carry 25 pounds frequently; 3) able to stand and/or walk about 6 hours in an 8-hour workday; 4) able to sit about 6 hours in an 8-hour workday; 5) unlimited ability to push/and or pull.  (DE 10, p. 313)  Dr. Allison concluded further that plaintiff could: 1) climb ramps/stairs frequently; 2) climb ladders/ropes/scaffolds occasionally; 3) balance, stoop, kneel, crouch, and crawl frequently.  (DE 10, p. 314)  Finally, Dr. Allison determined that plaintiff's only environmental limitation was to avoid concentrated exposure to fumes, odors, dust, gasses, poor ventilation, etc.  (DE 10, p. 316)

On November 30, 2009, Dr. Ong completed a cardiac RFC questionnaire at counsel's request (DE 10, pp. 382-86), addressed in detail *infra* at pp. 16-18, opining that plaintiff was incapable of performing even low stress jobs (DE 10, p. 383).

## B. Transcript of the Hearing

### 1. General

The hearing was held on December 1, 2009.  (DE 10, pp. 28-44)  Plaintiff was represented by counsel at the hearing.  (DE 10, pp. 28, 30)  The ALJ held the record open to receive into evidence a letter from plaintiff's supervisor/general manager where she worked.  (DE 10, p. 30)

### 2. Plaintiff's Testimony

Plaintiff testified under examination by the ALJ that she was forty-nine years of age at the time of the hearing, was divorced and lived with her youngest daughter, held a current driver's license without restrictions, had a highschool GED, had been working part time at the Waffle house since her heart attack, and was unable to work full time because of dizzy spells, hot flashes, shortness of breath and fluttering heart.  (DE 10, pp. 32-35)  Plaintiff testified that she had a heart attack on March 16, 2004, following which a blockage was "cleaned out" and a single stent implanted.  (DE

10, p. 34) According to plaintiff, she has been "real tired" and has had "dizzy spells" since then. (DE 10, p. 34) Plaintiff testified further that she had no side effects from the medicine she was taking. (DE 10, p. 34)

On examination by counsel, plaintiff testified that she quit working at Perdue Farms prior to her heart attack, because it was cold and wet on the assembly line, and her rheumatoid arthritis caused her to have pain in her hip. (DE 10, pp. 35-36) Plaintiff testified that she worked at Perdue Farms in the day, as a waitress at the Waffle House at night, and that she worked at the Short Stop Market and the Waffle House after she left Perdue Farms. (DE 10, pp. 36-37) According to plaintiff, she had to lift between sixty to seventy pounds at the Short Stop Market, but that she would be unable to do that at the time of the hearing because she lacked the strength. (DE 10, p. 37) Plaintiff stopped working at the Short Stop Market after her heart attack, but continued to work at the Waffle House. (DE 10, p. 37)

Plaintiff testified that her job at the Waffle House included doing the dishes, busing the tables, and running the cash register. (DE 10, p. 38) She testified further that her job required her to lift fifty to sixty pounds, but that her co-worker, Sherry Connor, did that work for her. (DE 10, p. 38) Plaintiff testified that she "probably" only carried between ten and fifteen pounds at the Waffle House, that she carried that weight "about" twenty feet, and that she did that three or four times an hour. (DE 10, p. 38) Plaintiff testified that she has to rest frequently at work, that she has missed a lot of work over the prior "couple [of] years," and that she is unable to work full time because of fatigue. (DE 10, p. 39)

### 3. Testimony of Sherry Connor

Ms. Connor testified on examination by the ALJ that she was plaintiff's coworker, and that they had worked together for a little more than a year. (DE 10, p. 40) Connor testified that she

agreed with plaintiff's testimony, adding that, in her opinion, plaintiff's situation at the Waffle House was "probably a little bit worse than what she ha[d] sa[id]." (DE 10, p. 40)

Connor testified as follows in response to questioning by counsel: plaintiff breaks into a sweat when working, she has to go outside for a breath of fresh air for fear that she will pass out, and she has to sit down to take a break until she can "help herself again." (DE 10, p. 40) Connor also testified that plaintiff got short of breath every night, even when not busy, that her attendance had fallen off "especially in the last six months," and that she missed a lot of work. (DE 10, pp. 40-41)

### 4. Other Evidence

The ALJ accepted into evidence a letter dated November 30, 2009 from Sharron Redwine, plaintiff's supervisor and general manager of the Waffle House. (DE 10, p. 175) Ms. Redwine noted the following in her letter: 1) plaintiff had worked for Ms. Redwine for six years; 2) she had seen plaintiff's "health and agility decline steadily in the last few years"; 3) she was "now able to work one job only part time"; 4) her attendance had declined from 99 percent to 40 percent; 5) her attendance had declined because of "poor health"; 6) she did not take her allotted vacation time because she could not afford to miss any more work; 7) she was not physically able to hold a full time job. (DE 10, p. 175)

### 3. The VE's Testimony

The VE first recapped plaintiff's work history, with respect to which he determined that plaintiff's prior work history ranged from light, unskilled to medium to heavy, semiskilled. (DE 10, pp. 41-42) The ALJ then posed four hypotheticals to the VE, all of which assumed an individual with the same work history and educational background as plaintiff's. (DE 10, p. 42)

The first hypothetical restricted the individual to the medium exertional level with no more that the occasional requirement to climb ladders and restrictions on heavy stock work that would

cross over into heavy exertion.  (DE 10, p. 42)  The VE testified that the individual could perform all of plaintiff's previous jobs.  (DE 10, p. 42)

The second hypothetical assumed a restriction to light exertional level and no more than the occasional need to climb ladders.  (DE 10, p. 42)  The VE testified that the individual could perform all of the light work that plaintiff previously performed.  (DE 10, p. 42)

The third hypothetical assumed restrictions on exposure to dust, fumes, smoke, chemicals, noxious gasses, extreme temperatures, and humidity.  (DE 10, pp. 42-43)  The VE testified that individual would not be able to perform plaintiff's past job as a poultry line worker, but that the individual would be able to perform all of plaintiff's other past jobs.  (DE 10, p. 43)

Finally, the ALJ asked the VE to consider an individual who, because of fatigue, was unable to complete an eight-hour day, forty-hour week on a regular basis.  (DE 10, p. 43)  The VE testified that such a person would be unemployable.  (DE 10, p. 43)

Counsel asked the VE to consider the effect of being incapable of performing low stress jobs, to which the VE responded that such an individual still would be capable of working as a mail sorter or in a janitorial position.  (DE 10, p. 43)  Counsel then asked the VE to further consider the need to take a ten-minute break every hour in an eight-hour work day and be absent from work more than four days a month.  (DE 10, pp. 43-44)  The VE testified that those requirements would render such a person unemployable.  (DE 10, p. 44)

### C.  The ALJ's Notice of Decision

The ALJ entered an unfavorable decision on January 5, 2010.  (DE 10, pp. 11-25)  The findings of fact and conclusions of law are summarized below:

> 1.    The claimant meets the insured status requirements of the
>        Act through December 31, 2013.  (DE 10, ¶ 1, p. 16)
>
> 2.    The claimant has not engaged in substantial gainful activity

since the alleged onset date.  (DE 10, ¶ 2, p. 16)

3.      The claimant has the following impairments, the combination of which are severe: coronary artery disease with history of acute inferior wall myocardial infarction,[11] status post PTCA[12] and stent placement to RCA,[13] March 2004; history of syncopal episodes; hypertension; degenerative joint disease with diffuse arthralgias;[14] chronic obstructive pulmonary disease with history of tobacco abuse; plantar fasciitis; and sleep disorder, not otherwise specified. (DE 10, ¶ 3, pp. 16-18)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  (DE 10, ¶ 4, p. 18)

5.      The claimant has the RFC to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that she can do more than occasional climbing of ladders, and is precluded from exposure to dust, fumes, chemicals, or noxious gases; and must avoid concentrated exposure to extreme temperatures and humidity.  (DE 10, ¶ 5, pp. 18-21)

6.      The claimant is capable of performing past relevant work as a Sewing Machine Operator, Mail Sorter, Server, or Line Worker in a factory setting. This work does not require the performance of work-related activities precluded by the claimant's RFC.  (DE 10, ¶ 6, pp. 21-22)

7.      The claimant has not been under a disability as defined in the Act from March 16, 2004 through the date of this decision. (DE 10, ¶ 7, p. 22)

---

[11] Myocardial infarction . . . Heart attack. *Dorland's* at 934.

[12] PTCA . . . Percutaneous Transluminal Coronary Angioplasty.  A method of enlarging the coronary artery by use of a stent in lieu of bypass cardiac surgery. *Dorland's* at 86.

[13] RCA . . . Right coronary artery. *Dorland's* at 1597.

[14] Arthralgias . . . Joint pain. *Dorland's* at 150.

# III. ANALYSIS

## A. Administrative Proceedings Below

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process described below to determine whether an individual is "disabled" within the meaning of the Act.

> First, the claimant must demonstrate that she has not engaged in substantial gainful activity during the period of disability.
>
> Second, the claimant must show that she suffers from a severe medically determinable physical or mental impairment.
>
> Third, if the claimant shows that her impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1, then she is deemed disabled.
>
> Fourth, the ALJ determines whether, based on the claimant's RFC, the claimant can perform her past relevant work, in which case the claimant is not disabled.
>
> Fifth, the ALJ determines whether, based on the claimant's RFC, as well as her age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 548 (6th Cir. 2004)(internal citations omitted); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). The claimant bears the burden of proof at steps one through four. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) The burden then shifts to the Commissioner at step five "to identify a significant number of jobs in the economy that accommodate the claimant's

residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm' of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

The Commissioner's burden at the fifth step may be met by relying on the medical-vocational guidelines, known in practice as "the grids," but only if the claimant is not significantly limited by nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics in the applicable grid rule. *See Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). In cases where the grids do not direct a conclusion as to the claimant's capacity, the Commissioner must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253 at *4 (S.S.A.)). In determining RFC for purpose of the analysis at steps four and five, the Commissioner is required to consider the combined effect of all the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *see Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

## B. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the findings of fact are supported by substantial evidence in the record, and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Key v. Callahan* 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different

conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). In other words, if the ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive. 42 U.S.C. §§ 405(g), 1383(c); *Key*, 109 F.3d at 273.

## C.  Claims of Error

### 1.  Whether the ALJ's Determination
### That Plaintiff Had the RFC to Perform Medium Work
### Is Supported by Substantial Evidence
### (DE 15, pp. 5-9)[15]

Plaintiff argues that the ALJ's determination that plaintiff had the RFC to perform medium work was not supported by substantial evidence, arguing in the main that the ALJ relied too heavily on the opinion of Dr. Allison, whose assessment is addressed *supra* at pp. 6-7. Plaintiff offers a three-part argument in support of this claim: 1) the ALJ did not explain the weight she gave to plaintiff's testimony at the hearing, or her reasons for rejecting plaintiff's testimony; 2) the opinions of Drs. Ong and Surber "detract[ed]" from the ALJ's determination that plaintiff was capable of performing medium work; 3) the ALJ failed to consider the testimony of Ms. Connor and Redwine.

Plaintiff's RFC is an assessment of "the most [she] can do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). In making this determination, the ALJ must consider all relevant evidence in the record. 20 C.F.R. § 404.1545(a)(1); SSR 96-8P, 1996 WL 374184 at * 5 (S.S.A.). This evidence includes medical records, opinions of treating physicians, and the claimant's own description of her limitations. 20 C.F.R. § 404.1545(a)(3). The ALJ is required to evaluate every medical opinion received. 20 C.F.R. § 404.1527(b). If the ALJ rejects a treating physician's opinion, then the ALJ must provide the basis for the rejection. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

---

[15]  The pages in DE 15 are not numbered. The page numbers referred to herein are the page numbers assigned by CM/ECF.

### a. Plaintiff's Testimony

Plaintiff's first argument pertains to the ALJ's treatment of plaintiff's testimony. This issue is addressed in the context of plaintiff's second claim, *infra* at pp. 20-23.

### b. The Opinions of Drs. Ong and Surber

### (1) Dr. Ong's Opinion

The ALJ characterized Dr. Ong as a treating physician, although at the time Dr. Ong completed the cardiac RFC questionnaire in November 2009, he had not treated plaintiff in more than four and one-half years. (DE 10, p. 20) The Magistrate Judge assumes without deciding that Dr. Ong was a treating physician for the purpose of this analysis.[16]

Under the standard commonly called the "treating physician rule," the ALJ is required to give a treating source's opinion "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)(quoting 20 C.F.R. § 404.1527(d)(2)). If the ALJ declines to give a treating source's opinion "controlling weight," then she must balance the following factors to determine what weight to give it: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportabilty of the opinion, consistency of the opinion with the Record as a whole, and specialization of the treating source." *Cole* 661 F.3d at 937 (quoting *Wilson*, 378 F.3d at 544)(citing 20 C.F.R. § 404.1527(d)(2)). The ALJ has the duty to "give good reasons in [the] notice of determination or decision for the weight . . . give[en] [a] treating source's opinion." *Cole,* 661 F.3d

---

[16] It is questionable whether Dr. Ong actually was a treating physician within the meaning of the Act, especially given the few number of times he treated plaintiff in the first place, and in the second place, the many years that passed between then and when he completed the cardiac RFC questionnaire. *See Smith v. Comm's of Soc. Sec.*, 482 F.3d 873, 875-76 (6th Cir. 2007)(a treating source is characterized by an ongoing relationship between a doctor and patient).

at 937 (citing 20 C.F.R. § 404.1527(d)(2)).  Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting SSR 96–2p, 1996 WL 374188 (S.S.A.)).

Dr. Ong's medical treatment records for the period April 7, 2004 through March 22, 2005 are discussed *supra* at pp. 2-4.  As previously noted, Dr. Ong completed a cardiac RFC questionnaire four-plus years later on November 30, 2009 at counsel's request.  (DE 10, pp. 382-86)  The ALJ wrote the following in rejecting Dr. Ong's cardiac RFC assessment:

> [T]he undersigned does not find the assessment of treating physician Samuel Ong, M.D. particularly credible with regard to the claimant's ability to do work-related activities.  While the undersigned recognizes the special consideration that should normally be given to a treating physician's opinions, Dr. Ong's opinion is entirely inconsistent with the record as a whole. . . .  Dr. Ong's assessments are incredibly over-restrictive in light of his own clinical findings . . . .  His conclusions are, at best, tenuous and patently sympathetic to the claimant's subjective complaints.  Accordingly, the undersigned does not accept Dr. Ong's conclusions with regard to the claimant's residual functional capacity.

(DE 10, pp. 20-21)  As shown below, a review of the medical record shows that the ALJ's rejection of Dr. Ong's opinion was fully justified.

In the cardiac RFC questionnaire, Dr. Ong checked "chest pain" as one of plaintiff's symptoms.  (DE 10, p. 382)  However, Dr. Ong's own records show that plaintiff's chest pain was intermittent at worst, improved over time, and often was not present at all.  There also is nothing in the later treatment records from CMC or PCA that suggests plaintiff suffered from chest pain in the years that followed.  Finally, as previously discussed, Dr. Surber noted three times in his RFC exam in August 2008 that plaintiff denied having chest pain.

Dr. Ong checked "fatigue," "shortness of breath," and "palpitations" as symptoms exhibited

by plaintiff. (DE 10, p. 382) Dr. Ong's own records show that he noted "+ for fatigue" on April 7, 2004, but specifically noted "no fatigue" in every OCR after that. Dr. Ong noted "+ for occasional shortness of breath" in the April 7, 2004 OCR, but specifically noted "no shortness of breath" in every OCR after that. Dr. Ong never noted palpitations in any of the OCRs.

Plaintiff did complain once of fatigue in the nineteen visits over four-plus years that she was treated at CMC, but that was a single event in the context of a diagnosis of possible diabetes. Although plaintiff reported fatigue while under the care of PCA beginning on December 11, 2007 (DE 10, pp. 218, 231), her fatigue was consistently reported as stable to better, and then not reported at all during plaintiff's last five months of treatment. As for Dr. Surber, he mentioned fatigue in his exam, but only in the context of plaintiff's descriptions of her arthritis symptoms on cold and/or damp days.

Plaintiff never complained about shortness of breath while being treated at either CMC or by PCA. Although Dr. Surber noted that plaintiff claimed to suffer from shortness of breath, he also noted that she did not appear short of breath during his exam.

Plaintiff did not complain of palpitations while being treated at CMC and by PCA. Plaintiff also did not complain of palpitations during Dr. Surber's exam.

Dr. Ong checked "sweatiness" and "weakness" as among plaintiff's symptoms. (DE 10, p. 382) There is nothing in Dr. Ong's own treatment records to support either of these notations. Nor is there anything in the CMC or PCA records that support these notations. As for Dr. Surber, he made no note of sweatiness, and noted only that plaintiff appeared weaker when standing on her left leg than when standing on her right leg. (DE 10, p. 311)

Dr. Ong notes in his RFC assessment that plaintiff experiences "chest pain. . . several times a day, left chest, [that] radiates to [the] left arm," and that the pain "happens with rest and with

physical exertion." (DE 10, pp. 382-83) For reasons already discussed, there is nothing in Dr. Ong's records, the records of CMC or PCA, or Dr. Surber's exam that supports such an observation.

Dr. Ong opined that plaintiff had marked limitation of physical activity for reasons of fatigue, palpitation, dyspnea, or anginal discomfort. (DE 10, p. 382) The issues of fatigue, palpitation, and anginal discomfort (chest pain) already have been discussed. As to the question of dyspnea, Dr. Ong noted on April 7, 2004 that plaintiff "+ for mild dyspnea on exertion." However, Dr. Ong noted "less dyspnea" in the October 27, 2004 OCR, and "no dyspnea on exertion" in the next two OCRs. Although Dr. Ong again noted "+ for dyspnea on exertion" in the March 22, 2005 OCR," Dr. Ong also noted "[n]o shortness of breath" in that same OCR. There is nothing in the CMC or PCA records, or in Dr. Surber's exam, that establishes dyspnea.

Finally, Dr. Ong notes that, "**according to [plaintiff]** she gets symptoms just talking." (DE 10, p. 382)(emphasis added) The wording of this statement strongly suggests that Dr. Ong is merely repeating plaintiff's subjective description of symptoms to him, and not referring to any medically determinable evidence on the record, including his own OCRs. This statement along with the utter dearth of evidence in the medical records to support Dr. Ong's RFC assessment strongly supports the ALJ's conclusion that Dr. Ong's opinions are "patently sympathetic to the claimant's subjective complaints."

For the reasons explained above, the ALJ did not err in finding Dr. Ong's opinion not particularly credible. Moreover, the ALJ gave good and proper reasons for rejecting his opinion. This part of plaintiff's first claim of error is without merit.

### (2)  Dr. Surber's Opinion

The ALJ characterized Dr. Surber as a "consultant examining physician," *i.e.*, as a non-treating but examining physician. (DE 10, p. 21) Social Security regulations classify "acceptable

medical sources into three types: nonexamining sources, nontreating (but examining) sources, and treating sources." *Smith*, 482 F.3d at 875. Dr. Surber is a nontreating but examining source because he examined plaintiff once. *See* 20 C.F.R. § 404.152. The ALJ is not required to give a "good reason" for the weight given to the opinion of a nontreating but examining source. *See Ealy v. Comm'r of Soc. Sec.*, 549 F.3d 504, 514-15 (6th Cir. 2010).

Dr. Surber's physical RFC assessment is discussed *supra* at pp. 5-6. The ALJ wrote the following in rejecting that assessment:

> The undersigned does not find Dr. Surber's determinations particularly credible with regard to the claimant's ability to do work-related activities. **Dr. Surber's assessment is entirely inconsistent with the largely normal clinical findings subsequent to his own examination.** Furthermore, the undersigned affords little weight to this physician's report and conclusions because he was not a treating physician and examined the claimant on only one occasion.

(DE 10, p. 21)(emphasis added)

The actual results of Dr. Surber's assessment support the ALJ's characterization of his clinical findings as "largely normal." A comparison of those "largely normal" results with Dr. Surber's final RFC assessment also supports the ALJ's conclusion that Dr. Surber's RFC assessment was "entirely inconsistent with . . . his own examination." Finally, as discussed at length *supra* at pp. 2-5, there is not one iota of medical evidence on the record that would support such a restrictive RFC assessment as that reported by Dr. Surber.

The ALJ did not err in discounting Dr. Surber's opinion. Moreover, although she was not required to, she gave good reason for her decision to reject Dr. Surber's opinion. This part of plaintiff's first claim of error is without merit for the reasons.

### c. Lay Evidence Provided by Ms. Connor and Redwine

The lay evidence provided by Ms. Connor and Redwine is presented *supra* at pp. 8-9. The

"Perceptible weight" is to be given to evidence provided by lay witnesses where that evidence is consistent with the medical evidence.  *See Jones v. Secretary of H.H.S.*, 945 F.2d 1365, 1370 n. 9 (6th Cir. 1991)(citing *Ashely v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983)).

The ALJ considered Ms. Connor's testimony at the hearing, and the information in the letter subsequently provided by Ms. Redwine.  (DE 10, p. 20)  The ALJ wrote the following with respect to this evidence:

> Neither the testimony of . . . Ms. Connor, nor the letter from . . . Ms. Redwine, establishes that the claimant is disabled.  Since neither of these individuals are medically trained to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms, the accuracy of their statements is questionable. . . . Moreover, by virtue of their close working relationships with the claimant, these individuals cannot be considered disinterested parties whose testimony and statements would not tend to be colored by affection for the claimant and the natural tendency to agree with the symptoms and limitations the claimant alleges.  **Most importantly, these opinions are simply not consistent with the preponderance of the other evidence**.

(DE 10, p. 20)(emphasis added)

Ms. Connor's testimony, and the circumstances alleged by Ms. Redwine in her letter, are unsupported by the medical evidence in the record.  The ALJ explained this very clearly. Therefore, this part of plaintiff's first claim of error is without merit.

### 2.  Whether the ALJ's Credibility Determination of Plaintiff is Supported by Substantial Evidence (DE 15, pp. 9-13)

Plaintiff asserts that the ALJ's reasons for partially discounting the credibility of plaintiff's subjective complaints were not reasonable.  Plaintiff argues that the ALJ erred in using the lack of verifiable objective medical evidence as the sole basis for determining that her subjective complaints were not credible.  Plaintiff also maintains that the ALJ improperly determined that plaintiff's part-

time work detracted from her credibility.

"[The] ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 475. Moreover, the ALJ's credibility determination is accorded "great weight and deference . . . since the ALJ has the opportunity . . . of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 475. Still, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and any subsequent reviews the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 (July 2, 1996). The ALJ's assessment of a claimant's credibility also must be supported by substantial evidence. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

The lay evidence at issue is addressed *supra* at pp. 8-9. The ALJ wrote the following with respect to that evidence:

> [T]he claimant testified that she continues to work at a Waffle House restaurant 'for a few hours at a time,' but that she has not been able to work full-time since her heart attack approximately five years ago. She maintained that she is unable to work full-time due to 'dizzy spells,' 'hot flashes,' shortness of breath, heart 'flutters,' and fatigue. She alleged that she had experienced a heart attack on March 16, 2004 with subsequent stent placement. She again generally alleged fatigue and 'dizzy' spells since that time. She testified that she knew of no side effects from her prescribed medications. . . . She alleged that she now has 'no strength' and that a co-worker carries heavy things for her when necessary. She stated that she must rest often, and that she has missed a lot of work over the last couple of years. She again insisted that she is fatigued and unable to work full-time. . . . [T]he objective findings and related impressions generally fail to fully substantiate the claimant's subjective complaints to the degree alleged.
>
> . . .
>
> [T]he claimant's statements concerning the intensity, persistence and

21

limiting effects of these symptoms are not entirely credible. In fact, her description of the symptoms have been somewhat atypical of the impairments documented by medical findings in this case. . . . Further, the claimant's descriptions of the symptoms have been quite vague and general, lacking the specificity which might otherwise make them more convincing. She has not provided convincing details regarding factors which precipitate or exacerbate the allegedly disabling symptoms, claiming that the symptoms are present 'constantly' or all the time. . . .

Although the claimant has generally described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily a]ctivities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision. Moreover, as mentioned earlier, the record reflects ***significant work activity after the alleged onset date***. Although that work has not constituted disqualifying substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally alleged. In fact, the claimant testified at the hearing that ***she continues to work*** despite her impairments.

(DE 10, p. 17)(emphasis in the original)

Plaintiff's testimony at the hearing was, for reasons already discussed, not supported by the medical evidence on the record. Therefore, the ALJ's credibility determination regarding plaintiff's testimony is supported by substantial evidence. As shown by the excerpt of the decision above, the ALJ did not limit her consideration to evidentiary considerations alone. The ALJ relied on her perceptions of plaintiff's testimony at the hearing as well. As for the claim that the ALJ improperly relied on plaintiff's part-time employment to discredit her credibility, it was entirely within the ALJ's discretion to consider plaintiff's part-time job as a daily activity in making her credibility

determination.  *See* 20 C.F.R § 404.1529(c)(3)(i)(factors relevant to subjective claims include daily activities).

For the reasons explained above, the ALJ did not err in her credibility determination of plaintiff's subjective complaints.  Accordingly, this claim is without merit.

### 3.  Whether the ALJ Provided Good Reasons
### for Rejecting the Opinions of Dr. Ong
### (DE 15, pp. 13-18)

Plaintiff argues that the ALJ erred in rejecting the opinions of Dr. Ong, a treating physician, and that she failed to provide a good reason for doing so.  This claim is without merit for reasons discussed previously, *supra* at pp. 15-18.

## VI.  RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the record (DE 14) be **DENIED**, and the Commissioner's decision **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein.  A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof.  Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal.  *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 15th day of August, 2013.

/s/Joe B. Brown
Joe B. Brown
United States Magistrate Judge